**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | |
|---|---|
| DWIGHT PFEIFFER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 2:10-cv-04001-NKL |
| ) | |
| JERRY WOLFE, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Dwight Pfeiffer, his spouse, Robin Pfeiffer, and his step-daughter, Jennifer Tice (collectively, "Plaintiffs") were employed by the Cooper County Sheriff's Department until they were dismissed on January 1, 2009, by then-newly elected sheriff, Jerry Wolfe ("Wolfe"). Plaintiffs now sue for wrongful termination under 28 U.S.C. § 1983, asserting that Wolfe terminated their employment due to their engagement in political speech activities and thus violated their First and Fourteenth Amendment rights. Pending before the Court is Wolfe's Motion for Summary Judgment. [Doc. # 21]. For the following reasons, Wolfe's motion is GRANTED in part and DENIED in part.

**I.    Factual Background**[1]

---

[1] The Court has considered the parties' statements of undisputed fact which are supported by evidence. In considering the pending motion, the Court has drawn all inferences in favor of the non-movant.

Plaintiffs were each employed by the Cooper County Sheriff's Department until December 31, 2008. Dwight Pfeiffer ("Dwight") held the position of road deputy; Robin Pfeiffer ("Robin") held the position of reserve deputy; and Jennifer Tice ("Jennifer") held the position of detention officer. The Plaintiffs are related to each other: Dwight and Robin are married, and Jennifer is Robin's daughter. Defendant Jerry Wolfe's employment at the Sheriff's Department began in 1994. At that time, Dwight was already an employee of the Sheriff's Department.

In 2008, Dwight was a candidate for Cooper County Sheriff and Robin was a candidate for Public Administrator. Jennifer provided support to the campaigns of both Dwight and Robin. Specifically, Jennifer was listed on Dwight's campaign brochures as the treasurer of "Pfeiffer for Sheriff." Jennifer also printed copies of campaign literature for both Dwight's and Robin's campaigns. Wolfe also ran for Cooper County Sheriff in 2008. Wolfe hoped that if he won, Dwight would voluntarily leave the Sheriff's Department.

In mid-July 2008, Wolfe discovered that the printing equipment at the Sheriff's Department was used to print copies of campaign literature when he replaced a printer's ink cartridge approximately one week after he previously replaced it. Upon replacing the cartridge, the printer resumed operation and printed a partial "Pfeiffer for Sheriff" brochure. Wolfe reported the incident and handed the flier to then-Sheriff Paul Milne. Upon looking into the computer's "event viewer" to review prior print jobs, Wolfe found several print jobs named "sheriff brochure doc" and "public administrator brochure doc." The only candidate

2

running for the office of public administrator who had access to the Sheriff's office was Robin Pfeiffer. By checking the computer's "event viewer" again, print jobs of "sheriff brochure doc" and "public administrator doc" amounted to 2,403 printed documents. Wolfe reported his findings to then-Sheriff Paul Milne, as the Sheriff makes all disciplinary decisions. [Doc. # 22-3, at 12 (103:3-9)].

Jennifer stated that she used the Sheriff's Department computer and printer to print campaign literature for both Dwight's and Robin's campaigns. Dwight was not initially aware that Jennifer used the Sheriff's Department's resources for printing the first batch of his brochures, but was aware of her use of the Department's equipment for subsequent printings. Robin discussed with Jennifer about using the Sheriff's Department equipment to print campaign materials and admits that she probably pushed Jennifer to do it. Neither Robin or Dwight reported Jennifer's use of the Department's equipment to print campaign materials. Neither Robin or Dwight reimbursed or offered to reimburse the Department.

Wolfe won the election for Sheriff. On or about December 29, 2008, Plaintiffs each received a letter from Wolfe, terminating their employment as of midnight on December 31, 2008. The reasons listed in the letters for their dismissal were: "Modification of staffing arrangements[;] Your services are no longer required." [Doc. # 25-1, at 2, 4, 6]. Robin's letter also included the reason "Downsizing of Reserve Unit." [Doc. # 25-1, at 4]. Plaintiffs were the only employees terminated by Wolfe at that time. In documents sent to the Missouri

Department of Public Safety ("MDPS"), Wolfe stated "[s]ervices no longer needed," as the reason for Dwight's and Robin's dismissal. [Docs. # 25-1, at 10, 14].

Wolfe testified that he terminated Plaintiffs based on reasons that arose since the end of 2007; namely, that he did not trust Plaintiffs. According to Wolfe, "trust is everything and you have to have people that are trustworthy, because they may be the one that's keeping somebody from putting a bullet through your head. That was a huge concern for me." [Doc. # 22-3, at 8 (79:16-19)]. He testified that because Jennifer took care of the finances of Dwight's campaign, and because the Plaintiffs all lived within close proximity of each other, it was highly unlikely that all three were not aware that copies of their campaign materials were printed at the Sheriff's Department for their personal gain. Wolfe specifically stated that his main trust issue with Dwight and Jennifer stemmed from the campaign literature copies made at the expense of the Sheriff's Department.

As to Robin, Wolfe testified that in addition to the campaign materials copying issue, he believed that Robin was falsifying her mileage reports that she submitted for reimbursement. As a reserve officer, Robin generally worked one regular shift per month, and worked a flexible schedule for the remainder of the month, with hours left to her discretion. Because she used her own vehicle for road patrols, the Sheriff's Department reimbursed her for mileage. Wolfe saw the mileage reports for December 2007 and March 2008 close to when they were turned in because they were laying on the office manager's desk. [Doc. # 25-1, at 26 (53:16-18)]. Based on his knowledge that other Cooper County

4

officers, highway patrol officers, and city marshals from other towns "weren't seeing" Robin or her patrol vehicle, and that the only other reserve officer who also used his own vehicle and worked just one scheduled shift per month was seen conducting building checks and road patrol by other officers, Wolfe testified that he thought that Robin's mileage sheets were problematic. [Doc. # 25-1, at 27 (54:25-55:11), 29 (77:2-7)]. Prior to dismissing Robin, Wolfe asked dispatch how many radio entries existed for Robin's shifts between the beginning of 2007 and the end of 2008, and was informed that there were "very minimal entries." [Doc. # 25-1, at 30 (78:2-4)]. However, prior to firing her, Wolfe was unaware of any incidents where Robin was scheduled to work where she was not able to be reached by radio, nor did he personally review radio log records prior to dismissing Robin. Wolfe admits that Robin was not expected to handle calls unless the Department was short handed and that she would sometimes call in to the Department using her cell phone, which may not have always been recorded on the Department's radio logs.

Wolfe also testified that news of a dispute, which he learned through two sources, between then-Sheriff Milne and Dwight also played a part in his decision to terminate Plaintiffs. Around August 2008, Captain Barbara Allphin, the jail administrator, informed Wolfe that there had been a "blow out" between then-Sheriff Milne and Dwight. The argument concerned comments allegedly made by Jennifer during work hours that Dwight was going to "clean house" and fire a number of employees if he were elected, which was brought to Sheriff Milne's attention by Captain Allphin. This was the second occasion that

5

such comments were brought to Sheriff Milne's attention. After learning of the first incident, Sheriff Milne instructed Captain Allphin to tell Jennifer to stop making those comments. Upon the second occasion, Sheriff Milne confronted Jennifer about the alleged comments and she denied making them. Sheriff Milne then told Dwight about Captain Allphin's report of Jennifer's comments. Dwight responded by stating that Sheriff Milne was lying, called Captain Allphin a "bitch," and that the only employee he was going to fire was Captain Allphin. Wolfe also heard about the incident from Rosemary Kraus, an office administrator who had overheard the altercation between Dwight and Sheriff Milne. She had interjected in the fight when Dwight said of her daughter, "F'g bitch is lying," after Sheriff Milne told Dwight that Kraus's daughter heard Jennifer's statements. [Doc. # 22-4, at 3 (30:6)]. Later, around August 7, 2008, Dwight authored and sent an email to a number of jail employees, including Wolfe, denying the rumor that he planned to terminate jail employees should he be elected sheriff, or made statements to that effect.

Then-Sheriff Milne testified that he "was going to fire [Dwight]" after Dwight called Sheriff Milne a liar, but he decided against it because he thought "it'd be political." [Doc. # 25-1, at 43 (35:9-10), 44 (38:23-25)]. Sheriff Milne also testified that as of December 31, 2008, there was nothing that Plaintiffs had done in their job duties for which he would have fired them. [Doc. # 25-1, at 47 (50:9-14)]. Specifically, Sheriff Milne testified that he did not think that the copying issue was severe enough that it required Dwight to be fired. [Doc. # 25-1, at 44 (38:10-16)].

6

Dwight believes he was discharged because he ran against Wolfe for Sheriff. Robin believes that she was terminated because she ran as a Democrat and because her husband ran against Wolfe. Robin adds that she heard a statement by an unidentified store clerk that Wolfe told people that he would fire the Pfeiffers if he won. Jennifer believes she was terminated because of Dwight's campaign for Sheriff. Based on these beliefs, Plaintiffs bring First Amendment retaliation claims against Wolfe for firing them due to their political speech.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

**III.  Discussion**

  **A.  Burden-Shifting Standard for Stating a First Amendment Retaliation Claim**

To establish a First Amendment retaliation claim, Plaintiffs must first show that their conduct was constitutionally protected and that the protected conduct was a "substantial" or "motivating" factor in the defendant's action which resulted in dismissal. *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008). "Whether the protected conduct was a substantial or motivating factor in an employment decision is a question of fact, but the sufficiency of the evidence to create an issue of fact for the jury is solely a question of law." *Id.* (citing *Cox v. Miller Cnty. R-I School Dist.*, 951 F.2d 927, 931 (8th Cir.1991)). Once Plaintiffs establish a prima facie case, the burden shifts to Wolfe to provide an "appropriate non-discriminatory reason for [his] action." *Reich v. Hoy Shoe Co.,* 32 F.3d 361, 365 (8th Cir. 1994). If Wolfe satisfies this burden, Plaintiffs must demonstrate that Wolfe's reasons are pretextual. *Id.* This analytical framework is the same as that used in Title VII retaliation claims. *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) (citing *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 878 (8th Cir.2005)).

  **B.  Protected Speech**

The parties agree that the protected political speech at issue is Dwight's running for elective office, Robin's and Jennifer's public support of his candidacy, and Robin's party

affiliation as a Democrat in her campaign for elective office. Plaintiffs clarify that Jennifer's use of the Sheriff's Department's printing equipment to produce campaign materials for Dwight and Robin and any speech associated with her alleged comments regarding the termination of employees if Dwight were to win the election, are not the basis of their claims against Wolfe. On this summary judgment motion, the Court assumes without deciding that the agreed upon speech at issue withstands the two-part *Pickering* test and is protected under the First Amendment. *See Bradley v. James*, 479 F.3d 536, 538 (8th Cir. 2007) (describing the *Pickering* test: (1) did the employee speak as a citizen on a matter of public concern? (2) if yes, did the government employer have an adequate justification for treating the employee differently from any other member in the general public?).

C.   **Plaintiffs' Prima Facie Case**

There is no dispute that Plaintiffs' speech, as limited to that relating to Dwight's candidacy for Sheriff, is protected and that Plaintiffs suffered an adverse employment action when they were terminated. Thus, to meet their burden of presenting a prima facie case, Plaintiffs must show "some evidence of a causal link" between Plaintiffs' protected speech and their subsequent terminations. *See Reich*, 32 F.3d at 367 (considering what evidence is sufficient to defeat summary judgment in retaliation cases); *Altonen v. City of Minneapolis*, 487 F.3d 554, 561 (8th Cir. 2007) (requiring Plaintiff to show a "causal connection" between her protected speech and the adverse employment action as part of establishing her prima facie case).

As a preliminary matter, Plaintiffs present no evidence that political party affiliation played any role in Robin's termination. Thus, the Court finds that Robin has failed to state a claim of retaliation based on her status as a Democrat. Plaintiffs' remaining claims, then, center around their termination due to their involvement with Dwight's campaign for Sheriff in opposition to Wolfe.

Plaintiffs argue that the time between their engagement in protected speech, which they appear to have participated in through election day in November 2008, and their dismissal at the end of December, is sufficiently minimal to satisfy a prima facie showing that their protected speech was a motivating factor in their dismissals. "[I]n general more than a temporal connection is required to present a genuine factual issue on retaliation." *Peterson v. Scott Cnty.*, 406 F.3d 515, 524 (8th Cir.2005) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (*en banc*)) (finding that Plaintiff demonstrated prima facie case when she showed that two weeks lapsed between her complaint and dismissal, evidence of internal employer communication regarding a termination on the date of Plaintiff's complaint, and that employer responded to Plaintiff's complaint with "maybe you should be somewhere else."). "[O]nly in cases where the tempora[l] proximity is very close can the plaintiff rest on it exclusively." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) (citing *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1087-88 (8th Cir.2010); *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) (two-week interval was "sufficient, but barely so") (quotation omitted)). Plaintiffs argue that although

they were not dismissed immediately following their protected speech, they were dismissed at Wolfe's earliest opportunity.

Other evidence pointed to by Plaintiffs–existence of a familial relationship, Wolfe's statement that his reasons for terminating them arose from his interactions with them since the end of 2007, and Wolfe's hope that Dwight would resign after the election–may not individually suffice to demonstrate improper motive. *See, e.g.*, *Cutcliffe v. Cochran*, 117 F.3d 1353, 1355 (11th Cir. 1997) (court upheld summary judgment on claim of improper termination based on familial relationship when Plaintiffs did little more than state the fact of their relation). However, such evidence bolsters the something "more" that is generally coupled with temporal proximity to demonstrate improper motivation. A reasonable juror could infer from such evidence, the inherent adversity involved in an election, and the timing of Plaintiffs' terminations–in the first moments that Wolfe gained the authority to terminate Plaintiffs–that their firings were motivated by the fact that they actively campaigned against Wolfe and supported Dwight, the opposing candidate. While the Eighth Circuit has held that "[t]he fact that a newly-elected hiring official discharges one or more at-will employees does not without more prove bad motive," *Langley v. Hot Spring Cty., Ark.*, 393 F.3d 814, 817 (8th Cir. 2005), an inference of bad motive exists here because of the timing of Plaintiffs' terminations and the additional evidence shown by Plaintiffs. Thus, the Court finds that Plaintiffs have satisfied the minimal threshold requirements of demonstrating a prima facie case.

### D. Whether Wolfe's Proffered Reasons for Termination are Pretextual

Given that Plaintiffs have presented a prima facie case, the burden now shifts to Wolfe to show that there was a legitimate, nondiscriminatory reason for his decision to terminate Plaintiffs. *Duffy v. McPhillips*, 276 F.3d 988, 991 (8th Cir. 2002). Wolfe provides one primary reason for terminating Plaintiffs–distrust of Plaintiffs due to the copying issue. Wolfe also states secondary reasons for terminating Plaintiffs: (1) Dwight's altercation with then-Sheriff Milne regarding comments allegedly made by Jennifer; and (2) additional distrust of Robin due to problematic-appearing mileage reimbursement sheets. Wolfe testified that trust is key in his profession due to the often life and death circumstances inherent in law enforcement. Plaintiffs do not argue that Wolfe's reasons are not legitimate, nondiscriminatory reasons that satisfy the burden-shifting analysis. Thus, for the purposes of this motion for summary judgment, the Court finds that Wolfe has satisfied his burden.

The Court now turns to whether Plaintiffs have presented evidence from which a reasonable juror could find that Wolfe's proffered reasons for terminating Plaintiffs are pretext for illegal retaliation. To carry this burden, Plaintiffs must show that Wolfe's proffered reasons are "unworthy of credence." *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 860 (8th Cir. 2005) (citation omitted). "Meeting the burden under this third step is more difficult for a plaintiff than at the prima facie stage because, here, evidence of pretext and discrimination are viewed in the light of the employer's justification." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008).

Plaintiffs first assert that at the time of their terminations, Wolfe's stated reasons for their terminations such as "services no longer needed," "modification of staffing arrangements," and "downsizing of Reserve Unit," do not comport with the primary reason provided by Wolfe during the course of the litigation–that he could not trust Plaintiffs. "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002) (quoting *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994)). Plaintiffs appear to argue that because Wolfe's answer of "services no longer needed" to the MDPS was intended to comply with Missouri law requiring that he "state the circumstances surrounding the departure from employment," Mo. Rev. Stat. 590.070.2, he can not now elaborate on that answer without creating an inference that his elaboration is pretext.

An employer may elaborate on a previously proffered answer without necessarily suggesting pretext. *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 855 (8th Cir. 2005). However, the employer's elaboration cannot be a substantial departure from its previous reasons. *See Morris*, 512 F.3d at 1019 (pretext can be shown with "evidence that the employer's proffered reasons for its employment decision has changed substantially over time"). One example of an elaboration that does not trigger an inference of pretext is the provision of additional aspects of an employee's violation that are not inconsistent with prior reasons. *See, e.g.*, *Rodgers*, 417 F.3d at 855; *Loeb v. Best Buy Co.*, 537 F.3d 867, 874 (8th Cir. 2005). Here, even though Wolfe's initial reasons do not necessarily contradict the trust

issues he later expressed, they are so vague that almost any later proffered reason would appear to be consistent with them. Indeed, Wolfe was required to "state the circumstances" of Plaintiffs' terminations to MDPS, which he failed to do. This, coupled with the stark generality of Wolfe's initial reasons, as compared to the specificity of Wolfe's later responses during the course of this litigation, would permit a reasonable juror to infer that Wolfe's initial and later proffered reasons do not share the same origin, evidencing a "substantial change." Thus, although Plaintiffs point to no evidence that Wolfe has retreated from any of his initial explanations, that alone does not defeat Plaintiffs' assertion that Wolfe's "trust issues" reason is pretext. One could expect that a law enforcement officer would notify the Highway Patrol if police department employees, including a commissioned officer, could not be trusted.

Plaintiffs next argue that because then-Sheriff Milne had not disciplined them for their actions, such as unauthorized copying and printing, then all issues had been resolved and therefore did not warrant discipline. A plaintiff may show pretext if the employer's proffered reason is "so irrational that it is effectively no reason at all." *Erickson v. Farmland Indus.*, 271 F.3d 718, 730 n.6 (8th Cir. 2001) (citing *Greer v. St. Louis Reg'l Med. Ctr.*, 258 F.3d 843, 847 (8th Cir. 2001)). One example of this is where a plaintiff received recent favorable reviews in contrast to proffered reasons of poor performance. *See Morris*, 512 F.3d at 1019. Here, Sheriff Milne's failure to discipline Plaintiffs does not amount to a "favorable review." Indeed, Sheriff Milne testified that he "was going to fire" Dwight because Dwight called him

a liar, but did not do so because he thought it would be political. However, even if Sheriff Milne's failure to terminate Plaintiffs does not amount to a "favorable review," a reasonable juror could infer that because then-Sheriff Milne did not terminate Plaintiffs for the unauthorized copying, then Wolfe's decision to terminate them for that same reason was suspect, especially given Dwight's long service history of over sixteen years.

Plaintiffs similarly argue that Wolfe's additional reasons for firing them are also pretext. As to Dwight's altercation with then-Sheriff Milne, Plaintiffs state that testimony is unclear as to who actually heard Jennifer's comments and whether they were made, how then-Sheriff Milne learned of Jennifer's alleged comments, and the veracity of the reports of the incident and underlying events that Wolfe received. According to Plaintiffs, it was unreasonable for Wolfe to rely on rumors to terminate Plaintiffs and therefore the rumors are unlikely to be Wolfe's real reason for Plaintiffs' terminations. As to Robin's questionable mileage reimbursement requests, Plaintiffs state that Wolfe failed to retrieve any information from radio logs to investigate his concern until a few weeks prior to terminating Robin, and because it remains a question of fact whether Wolfe adequately informed then-Sheriff Milne of his concern regarding Robin's mileage requests. This evidence appears to suggest that Robin's mileage was not of actual concern to Wolfe. Thus, it is possible for a reasonable juror to infer that these secondary proffered reasons are "unworthy of credence", and the more likely reason for their termination was their political activity.

The Court finds that Plaintiffs have met their burden of presenting evidence from which a reasonable juror could conclude that Wolfe's proffered reasons are pretextual. True, Plaintiffs admit their involvement with the unauthorized copying: Dwight accepted and distributed fliers that he knew were printed at the Sheriff's Department; Robin encouraged Jennifer to make the copies at the Department and used campaign literature printed at the Department; and Jennifer actually printed the copies on the Sheriff's Department's equipment. However, merely because misconduct occurred does not mean that Plaintiffs were not fired due to Dwight's candidacy and their support for his campaign. Plaintiffs have adequately shown that this question can only be decided by a trier of fact.

### E. Qualified Immunity

Qualified immunity protects public officials from civil liability for their actions which "do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Shockency v. Ramsey Cnty.*, 493 F.3d 941, 947 (8th Cir. 2007) (quotation omitted). The rights at issue are Plaintiffs' First and Fourteenth Amendment rights. The action in question is Wolfe's termination of Plaintiffs due to their participation in protected speech. Clearly, a reasonable official in Wolfe's position would understand that terminating his employees for participating in political speech activities is a violation of the employees' right to free speech. The Court finds that Wolfe is not entitled to qualified immunity.

Wolfe attempts to characterize his terminations as the dismissals of incompetent employees. [Doc. # 22, at 29]. However, Wolfe misunderstands the nature of the Court's inquiry at this stage of its analysis. Plaintiffs have already met their burden in demonstrating that there are genuine issues of material facts for the jury to decide regarding the reasons why they were terminated. This dispute of fact also precludes summary judgment on the issue of qualified immunity.

### III. Conclusion

Accordingly, it is hereby ORDERED that Defendant Jerry Wolfe's Motion for Summary Judgment [Doc. # 21] is GRANTED as to Robin Pfeiffer's claim that she was terminated due to her status as a Democrat. In all other respects, the Motion is DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: April 11, 2011
Jefferson City, Missouri